In the Matter of the Application of HAWAIIAN ELECTRIC COMPANY, INC., for Approval of Rate Increases and Revised Rate Schedules

NO. 5374

MAY 7, 1975

RICHARDSON, C.J., KOBAYASHI, OGATA AND MENOR, JJ., AND CIRCUIT JUDGE KATO IN PLACE OF LEVINSON, J., RECUSED

OPINION OF THE COURT BY MENOR, J.

This is an appeal by Life of The Land, a nonprofit corporation whose objectives are the protection and preservation of

the environment of the people of Hawaii, and Tony Hodges, an individual [hereinafter appellants] from Decision and Order No. 3008 of the Public Utilities Commission of the State of Hawaii [hereinafter PUC], dated August 17, 1972.

Hawaiian Electric Company, Inc. [hereinafter HECO], filed its initial application for a rate increase and revision of rate schedules on April 27, 1971. The rate increase requested was to produce a sales revenue increase of 9.7% or $7,898,000. HECO further requested a rate of return on its rate base of no less than 8.5%. The application was amended on June 25, 1971, to cure technical defects, and again on October 13, 1971, to request approval of an environmental control clause.

After due notice given by the PUC, public hearings on HECO's application were held in Honolulu, Kailua, and Waipahu, on November 9, 10, and 11, 1971, respectively. Extensive testimony on environmental matters was given by representatives of appellant Life of The Land at each of the hearings. Appellant Hodges gave testimony at the Kailua hearing.

On August 10, 1971, the appellants filed a petition to intervene in the PUC economic hearings, alleging, *inter alia*, that appellant Hodges was a Hawaii resident and a subscriber of HECO services, and that appellant Life of The Land was a user of HECO services, as well as being a membership organization concerned with protecting and preserving the environment of the people of Hawaii. The appellants conceded that their intervention would broaden the immediate issue and cause a delay in the proceedings but urged the commission to grant their petition because it was "imperative that the environmental aspects of electricity generation and consumption be presented to the public."

After a hearing on January 24, 1972, the PUC denied the appellants' petition for intervention, but granted them participation status and directed them to present any relevant material they might have through the PUC staff, which was being represented by Deputy Attorney General Harry Kim.

Hearings on the merits of HECO's application began on January 24, 1972, and continued throughout certain periods of the months of January, March, April, and May, 1972. HECO offered the testimony of eight witnesses; the PUC staff offered the testimony of seven. HECO supplied the staff with all materials that were requested, and submitted a total of 89 exhibits, the staff submitting an additional 20.

The appellants were represented at practically all of the hearings; met with PUC staff members to discuss the case; submitted proposed cross-examination questions for HECO's witnesses to Mr. Kim, who used those he deemed pertinent to the inquiry at hand; and presented limited testimony on the environmental control clause. Further, the appellants were permitted to submit proposed findings of fact and conclusions of law.

The PUC rendered its decision on August 17, 1972. It granted HECO an increase in its rates to produce an 8.25% rate of return on its rate base. It also allowed HECO $549,000 for promotional expenses, contrary to the recommendations of both the appellants and the PUC staff. After the appellants' petition for a rehearing was denied by the PUC on December 7, 1972, they filed this present appeal. The PUC staff has not filed an appeal in this case.

I

The appellants sought party intervenor status pursuant to PUC Rule 12.02. Their petition was denied, and they were instead allowed a participatory role under PUC Rule 12.03, which permits involvement to the degree directed by the presiding officer.

Intervention as a party in a proceeding before the PUC is not a matter of right but is a matter resting within the sound discretion of the commission. HRS Section 269-13; cf. H.R.C.P. Rule 24. This is generally true in proceedings before administrative agencies. 1 F. Cooper, *State Administrative Law*, 325 (1965). *See also City of San Antonio v. C.A.B.*, 374 F.2d 326 (D.C. Cir. 1967); *P.U.C. v. United*

*States,* 356 F.2d 236, 241 (9th Cir. 1966), *cert. denied,* 385 U.S. 816; *Pittsburgh v. Pennsylvania P.U.C.,* 153 Pa. Super. 83, 33 A.2d 641 (1943). This rule, however, is always subject to the essential qualification that this discretion is not to be arbitrarily and capriciously exercised. In this case, we are satisfied that the commission did not abuse its discretion in denying the appellants' motion for intervention.

It is clear that had the appellants been accorded intervenor status, they would have had the right to appeal all interlocutory and final orders affecting them. *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275 (1946); *Securities & Exch. Comm'n v. United States Realty & Improvement Co.,* 310 U.S. 434 (1940). But having been denied party intervenor status, although allowed participation in this case, are the appellants now properly before this court? In other words, have the appellants the requisite standing to obtain judicial review of the decision and order of the PUC granting HECO a rate increase?

The question of standing is essentially one that resolves itself into the elementary proposition that one who is injured by the act of another may legally challenge the propriety of the action. But the answer to the threshold question of "who is injured" for purposes of judicial review is not always so obvious.

The Hawaii Administrative Procedure Act as codified in Chapter 91 of the Hawaii Revised Statutes entitles "[a]ny person aggrieved" by the action of an administrative agency to judicial review. In *East Diamond Head Association v. Zoning Board,* 52 Haw. 518, 479 P.2d 796 (1971), this court considered the question of what constituted an aggrieved person under the Act for purposes of appeal. There, an unincorporated landowners' association sought to challenge a variance that had been granted by the Zoning Board of Appeals of the City and County of Honolulu. The variance would have allowed a parcel of land adjacent to property held by members of the association to be used as a location for movie production. Association spokesmen testified at a public hearing that the movie operations would interfere with their prop-

erty enjoyment. Such operations, their evidence indicated, would cause a significant increase in the level of noise, traffic, and congestion, as well as promote inconvenience generally, and impair the aesthetic character of the surrounding neighborhood. We reversed the trial court's holding that the association lacked the standing required to secure review since they had failed to intervene in the board's proceedings. Adopting the construction that a "person aggrieved" is one whose personal or property right has been injuriously or adversely affected by an agency's action, we held, *inter alia,* that the action of the board in granting the zoning variance "immediately and directly affect[ed] each homeowner," and thus, that the association had established its status as a person aggrieved. *See also Dalton v. City and County,* 51 Haw. 400, 403, 462 P.2d 199, 202 (1969) (standing found where plaintiffs resided "in very close proximity" to property alleged to have been improperly rezoned.)

In addition to the requirement that an aggrieved party be specially, personally and adversely affected for standing to lie, this court has added a further gloss to the standing issue as regards administrative proceedings. In *City and County v. P.U.C.,* 53 Haw. 431, 495 P.2d 1180 (1972) we held that the person aggrieved must have been *involved* in the contested case. It is not enough that a person has been "aggrieved" by agency action. He must also have contested the issue before the agency. However, this adversary participation need not be confined to formal proceedings before the agency. In *East Diamond Head Association* we held that a public hearing, conducted pursuant to published notice, was a "contested case" within the meaning of HRS § 91-1.

The appellants are users of electrical energy, and two members of appellant Life of the Land, in opposing the rate increase, testified that they would be paying the higher utility rates. A ratepayer who is compelled to pay higher utility rates by agency action is a person specially, personally and adversely affected. The fact that he shares this additional burden with all other users does not disentitle him from challenging the results. *Cf. United States v. SCRAP,* 412 U.S. 669

(1973); *Sierra Club v. Morton,* 405 U.S. 717 (1972).[1] But he must pursue his remedies through established and legitimate channels.

In proceedings before the PUC, the Director of Regulatory Agencies is mandated by law to represent and protect the interests of consumers throughout the State. HRS § 26-9 (Supp. 1974). He is an indispensable party to the proceedings, and in that capacity he acts through the technical staff and other personnel of the commission, aided by a specially designated deputy attorney general. *In re Hawaiian Telephone Co.,* 54 Haw. 663, 513 P.2d 1376 (1973).

The PUC staff, however, failed to appeal the decision of the PUC with regard to the rate increase. The practical effect of denying the appellants standing here would be to silence the voice of all those who would speak in the public interest, a duty that normally resides with the PUC staff. We hold, therefore, that where the appellants have been "aggrieved" by the action of the PUC, and where they were involved as "participants" during the agency hearings, and where the PUC staff (the agency through which they participated at the hearings) has failed to appeal the decision of the PUC, the appellants may challenge the order of the PUC in this court. We shall thus consider their appeal.

II

We turn now to the question of whether the decision of the PUC should be affirmed, reversed, modified, or remanded

---

[1] We note that the trend in American jurisprudence as evidenced by recent decisions of this court and courts across the land, has been to broaden the class of persons that have standing to challenge agency action. The United States Supreme Court has clearly indicated that standing cannot be confined only to those who allege economic harm, nor can it be denied to others simply because many persons share the same purported injury:

"Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." United States v. SCRAP, 412 U.S. at 686 (quoting Sierra Club v. Morton, 405 U.S. at 734).

for further proceedings consistent with our opinion.[2]

We are satisfied from an exhaustive review of the record that, except for the allowance of promotional expenses, there is substantial evidence properly and thoroughly adduced to support the commission's decision and order.

The appellants contend that the PUC's decision to permit HECO to include promotional expenditures in its budget for ratemaking purposes was arbitrary and unreasonable, and contrary to the best interests of the general public. The PUC staff found itself in complete agreement with the appellants on this issue, and thus recommended the allowance of sales expenses in the sum of $713,100 but opposed HECO's request for promotional expenditures. The commission, however, approved the total sum of $1,262,100, including $549,000 for promotional activities. HECO's original request was broken down as follows:

*Programs due to competitive fuels*

| | | |
|---|---|---|
| Home Builder Program | $148,500 | |
| Apartment Builder Program | 105,000 | |
| Cooperative Advertising | 102,500 | $356,000 |

*Other programs to increase*
*kilowatt-hours per kilowatt usage*

| | | |
|---|---|---|
| Domestic Appliance Program | $123,000 | |
| Commercial Cooking Program | 17,400 | |
| Commercial Water Heating | 17,500 | |
| Commercial Air Conditioning | 9,500 | |
| Medallion Program | 700 | |
| Signs Program | 1,800 | |
| 100-Amp. Program | 1,800 | |
| Lighting and Wiring Program | 4,000 | |
| Special (Sales Program) | 13,200 | |
| AEBA Program | 5,000 | $193,900 |
| Total | | $549,900 |

---

[2] HRS § 91-14(g) provides as follows:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have

The programs due to competitive fuels are designed to attract new customers and, where possible, capture customers and usage from the Honolulu Gas Company [hereinafter GASCO], while defending against similar efforts on the part of GASCO, the electric company's sole competitor in this area. They consist mainly of allowances of payments to owners and developers who build all-electric homes and apartments and advertise them for sale as such.

There is decidedly a serious question as to the legality of these rebates or allowances,[3] but we do not deem it advisable to decide that particular issue, inasmuch as it was not briefed and argued before this court. Moreover, we need not reach that issue, for we are satisfied that in the context of our times, these promotional expenditures on the part of regulated public service companies are wasteful and unreasonable,[4] and

---

been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[3] In its Opinion No. 65-18, dated May 11, 1965, the Attorney General ruled these promotional practices to be proscribed rebates under Section 104-15 of the Revised Laws of Hawaii 1955, as amended (now HRS § 269-16 (Supp. 1974)). In a subsequent legal memorandum, dated November 5, 1969, the Attorney General advised the PUC that it, ultimately, must make its own determination of the reasonableness or unreasonableness of these promotional practices.

[4] At the hearings before the PUC, HECO very candidly acknowledged that if these promotional activities were forbidden to both utilities, their respective shares of the market would remain the same. In his testimony before the PUC, Mr. Carl H. Williams stated:

"Q And if neither offered these programs, promotional allowances, each to stand on its own merit of gas or electricity, then where would you say would be your share of the market?

A My estimate is that it would be the same.

Q You would still gather that segment or that portion of the market which would normally want to use electricity and that portion of the market which wants gas would get gas without the promotional allowances?

A I think we would get similar proportion to what we're getting now, yes. . . ."

their allowance by the commission was an abuse of its discretion.

The disturbing aspect of the PUC decision to allow expenditures for these programs is the rationale behind it. GASCO had been granted an allowance for similar promotional expenditures earlier. *See Decision and Order No. 2621* (PUC of Hawaii, Aug. 31, 1970). GASCO, in making its request, had argued that the expenses were necessary to attract customers away from Hawaiian Electric. HECO, in its present application for a rate increase, pointed to the GASCO allowance as justification for its own request. It seems apparent from the record that the PUC's decision was based on this particular argument of HECO.

The PUC has consistently failed to meet squarely the issue of the reasonableness of competitive advertising expenditures. In late 1963, the PUC ordered the opening of Docket No. 1581 for the avowed purpose of inquiring into the promotional practices of the utilities, pursuant to the authority vested in it by Section 104-15 of the Revised Laws of Hawaii 1955, as amended (now HRS § 269-16 (Supp. 1974) ).[5] On April 24, 1964, the commission issued its Order No. 1417, requiring the utilities to show cause why certain of their promotional practices should not be discontinued. To date no concrete action aimed at a final resolution of the problem has been taken by the commission. On the contrary, it has recently closed Docket No. 1581, thereby assuring the continuance of its practice of passing upon allowances for promotional expenditures on a case-by-case basis, and lending unwarranted validity to the circular arguments of HECO and GASCO.

One of the primary factors the PUC must take into consideration when it fixes rates is fairness to the ratepayer. Obviously, the particular type of advertising competition involved here does not benefit the ratepayer. *See Southern*

---

[5] ". . . The commission may, after a hearing, by order regulate, fix and change all such rates, fares, charges, classifications, rules and practices, so that the same shall be just and reasonable, and prohibit rebates and unreasonable discrimination between localities, or between users or consumers, under substantially similar conditions . . . ."

*California Edison Co.,* 90 PUR 3d 1, 17, 20-23 (Cal. PUC 1971); *Re Promotional Prac. Pub. Util. & Co-op. Util. Assoc.,* 97 PUR 3d 1, 3 (Okl. Corp. Comm'n. 1972). There are alternative, viable means to promote sound competition among utilities, particularly between two utility companies (HECO and GASCO) which have already established themselves in Hawaii's marketplace. Efficiency of management, technological improvements, superiority of service, and economy of costs should more properly provide the bases for any competition between them.

By basing its decision purely on the previous grant of similar expenditures to a competing utility, the PUC has failed to give adequate consideration to the interests of the ratepayer and has thereby abused its discretion. HECO's budgetary request for $356,000 for programs due to competitive fuels (gas) should have been disallowed.

We turn now to the propriety of allowing the remaining $193,000 for promotional programs designed to increase the use of electricity and purportedly to improve the company's load factor. These programs consist essentially of direct advertising and contributions to dealer and distributor advertising of certain electric appliances.

HECO has failed to show the reasonableness of considering these expenses for ratemaking purposes, when it is not possible to also consider the presumed profits attributable to the sales which these expenditures partially stimulate. HECO, is in effect, subsidizing the promotional activities of dealers and distributors whose commercial transactions form no part of HECO's own business venture. GASCO, on the other hand, sells gas appliances as an essential component of its commercial operations. Such activities on the part of a utility have been held to be legally permissible. *Honolulu Gas Co. v. P.U.C.,* 33 Haw. 487 (1935).

HECO has also failed to satisfactorily show how much of an improvement in its load factor these expenses can reasonably be said to make. Admittedly, the sale of more electrical appliances would result in the increased use of electrical

energy and could improve HECO's load factor.[6] How much of an increase there would be, however, is dependent upon the proportion of appliance sales attributable to replacements as compared with that attributable to new users. Moreover, since the appliances being promoted by HECO are those generally in use during peak-load periods, it is difficult to see how HECO can argue that these expenses encourage the increase of off-peak utility loads.

The burden is always on the applicant to prove justification for a requested rate increase. *In re Hawaiian Telephone Co.*, 54 Haw. 663, 672, 513 P.2d 1376, 1381 (1973) (concurring and dissenting opinion of Abe, J.). HECO also had the burden of showing the propriety of its request for these promotional expenditures. We are not satisfied that it has carried its burden. Accordingly, HECO's budgetary request for the remaining $193,000 for promotional programs should also have been disallowed.

It is not our intention to belabor the obvious, but the stark reality of the situation is that our energy problems and our environmental concerns are here to stay. In the face of dwindling oil supplies and spiralling costs, promotional practices which are wasteful or which only serve to fuel the energy crisis should be viewed by a regulatory agency with extreme caution. *See Southern California Edison Co., supra; Kansas Gas and Electric Co.*, 95 PUR 3d 247 (Kansas State Corp. Comm'n. 1972); *Re Promotional Prac. Public Util. & Co-op. Util. Assn., supra; Duke Power Co.*, 88 PUR 3d 230 (N.C. Utilities Comm'n. 1971); *Consumers Power Co.*, 3 PUR 4th 321 (Mich. Pub. Serv. Comm'n. 1974); *Narragansett Elec. Co.*, 1 PUR 4th 60 (R.I. PUC 1973); and *Wisconsin Gas Co.*, 99 PUR 3d 160 (Wis. Pub. Serv. Comm'n. 1973).

---

[6] It is somewhat ironic that while HECO representatives had urged the approval of promotional expenditures for the sale of appliances with high energy requirements, such as electric dryers and frost-free refrigerators, on the theory that it would effect savings to the general consuming public over the long haul, a recent statement in the Honolulu Advertiser, of February 10, 1975, attributed to the president of the company should give us pause:

"Brennan and [Carl H.] Williams agreed that there is not much the Hawaii homeowner can do to cut his electric bills — beyond turning off the lights and TV when they are not in use."

That part of the decision and order of the PUC allowing promotional expenses in the sum of $549,000 is reversed. In all other respects, it is affirmed.

*Edward C. Kemper III (Mattoch, Kemper & Brown* of counsel) for appellant.

*Marshall M. Goodsill* and *Gary S. Okabayashi (Goodsill, Anderson & Quinn* of counsel) for appellees.